**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THERESA PETERSON DORSETT, on behalf of her granddaughter, NAIJAH PETERSON DEEDS, a minor, and on her own behalf, | : : : : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : : | |
| v. | : : | No. 04-5968 |
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, | : : : | |
| Defendant. | : : : | |

**MEMORANDUM**

**ROBERT F. KELLY, S.J.**                                    **AUGUST  29, 2005**

      Presently before this Court is Defendant Southeastern Pennsylvania Transportation Authority's ("SEPTA") Motion for Summary Judgment.  For the reasons that follow, the Motion must be granted.

**I.      BACKGROUND**

      Defendant SEPTA is a municipal authority of the Commonwealth of Pennsylvania that provides public transportation services to the Philadelphia Metropolitan Area.  SEPTA services are provided though its bus, trolley, subway, and regional railroad systems.  SEPTA carries over 157.7 million passengers per year on its buses alone, and provides service to over 35,000 wheelchair bound bus passengers per year.

      Plaintiff Naijah Peterson Deeds ("Naijah") is a four year old child.  Naijah was born with cerebral palsy and has multiple severe disabilities and, as a result, she cannot stand or walk on her own.  She is, therefore, confined to a wheelchair.  Plaintiff Theresa Peterson Dorsett

("Ms. Dorsett") is Naijah's maternal grandmother and her legal guardian.  Naijah has lived with Ms. Dorsett since 2002.

Because Naijah's medical condition prevents her from standing or walking on her own, Naijah's treating physicians at the Children's Hospital of Philadelphia recommended that she be fitted for a specialized wheelchair which was delivered to Naijah on July 23, 2003.  To meet Naijah's specialized medical and positioning needs, the Kimba Country Stroller manufactured by the German company Otto Bock was selected.  The wheelchair, which is designed to resemble a regular stroller, has special features designed for Naijah including: head supports to position her head and prevent involuntary movements, lateral postural supports on the seat and back to support her trunk ensuring that she is seated straight, front rigging with heel hoops and toe straps to secure her feet and keep them from kicking, a chest harness and pelvic belt for security, and additional thigh supports for positioning.  The stroller also reclines for support and to assist with Naijah's digestive problems.  Although Naijah's wheelchair is designed to and does look substantially similar to a typical child's stroller, it is in fact a medical device used for her transportation.  Naijah's wheelchair is much heavier than a traditional child's stoller, weighing over thirty pounds unoccupied, and contains the special features necessary to properly support Naijah.

Plaintiffs are frequent users of SEPTA buses and the Market-Frankford Elevated subway line operated by SEPTA.  During the period between 2003 and July 2004, Plaintiffs took approximately 760 rides on SEPTA buses, and received good service from SEPTA in the majority of cases.  However, SEPTA's service has been far from exemplary.

In the period between 2003 and July 2004, Naijah and Ms. Dorsett have experienced a dozen incidents of poor service from SEPTA in which they received less

assistance than they were entitled to from SEPTA while riding the busses.  Specifically, Plaintiffs present the following incidents:

1.      On August 29, 2003, at 58th Street and Warrington Avenue, Ms. Dorsett requested that the driver of bus 5377 deploy the wheelchair lift so Naijah could access the bus.  The driver refused to deploy the lift, and told Ms. Dorsett to bring the stroller though the rear door of the bus.  With the help of another passenger, Ms. Dorsett brought the stroller through the rear door and up to the front of the bus with Naijah seated in the stroller.  Once in the front of the bus, Ms. Dorsett asked the driver to secure the stroller using the four tie down straps.  The driver refused, and Ms. Dorsett secured the wheelchair herself.

2.      On December 13, 2003, at 58th Street and Warrington Avenue, the driver of bus 3479 refused to deploy the wheelchair lift for Naijah to access the bus.  The driver told Ms. Dorsett to fold the stroller and carry Naijah aboard using the steps at the front of the bus.  Ms. Dorsett informed the driver that the stroller was a wheelchair.  The driver then informed Ms. Dorsett that the bus was full and told her to catch the follower bus.  The driver did not ask anyone sitting in the priority seats to move to accommodate Naijah.  Ms. Dorsett observed that the bus was not full and that there was room in one of the wheelchair berths to accommodate Naijah.  However, Ms. Dorsett and Naijah did not board the bus and it departed without them.

3.      When the follower bus, number 3346, approached the bus stop, it slowed but did not stop.  The bus overshot the stop and stopped in the intersection where Ms.

Dorsett felt it was unsafe to board.  The bus continued on without Ms. Dorsett and Naijah.

4.     On or about August 26, 2004, at Academy and Comly Roads, after boarding the bus using the wheelchair lift, Ms. Dorsett requested that the driver of bus 5548 properly secure Naijah's wheelchair using the four tiedown straps.  The driver secured the wheelchair using only one strap, and the chair lurched forward when the bus moved, hitting the luggage area at the front of the bus.  When Ms. Dorsett asked the driver to resecure the stroller, he told her he did not know how to secure that type of wheelchair.  Ms. Dorsett then secured the chair herself using three additional tiedown straps.

5.     On August 30, 2004, at Newberry and Academy Roads, the driver of bus 5922 refused to deploy the lift for Naijah's wheelchair stroller.  After Ms. Dorsett informed him that the stroller was a wheelchair and that she needed the lift to board the bus, the driver deployed the lift.  Once on the bus, Ms. Dorsett requested that the driver secure the wheelchair; however, he did not do so until Ms. Dorsett began to argue with him.

6.     Also on August 30, 2004, at Franklin Mills Mall, the driver of bus 5556 refused to deploy the lift for Naijah's wheelchair stroller.  After Ms. Dorsett informed him that the stroller was a wheelchair and that she needed the lift to board the bus, the driver deployed the lift.  Once on the bus, Ms. Dorsett requested that the driver secure the wheelchair; however, he did not do so until Ms. Dorsett began to argue with him and then improperly secured the wheelchair.

7.      On September 1, 2004, after boarding the bus using the wheelchair lift, Ms. Dorsett requested that the wheelchair be secured.  The driver of bus 5354 refused her requests, and Ms. Dorsett secured the chair herself.

8.      On October 12, 2004, at Academy and Newberry Roads, Ms. Dorsett requested that the driver of bus 5924 deploy the wheelchair lift for Naijah's wheelchair stroller.  The bus driver refused, telling Ms. Dorsett to fold the stroller and carry Naijah and it onboard the bus.  After argument, the bus driver deployed the lift and Naijah boarded the bus.  Once onboard, Ms. Dorsett requested that the driver secure the wheelchair; however, the driver refused.  After further argument, the driver told Ms. Dorsett to get off the bus.  When several passengers joined in the argument, the driver radioed SEPTA control and Ms. Dorsett called 911 using her cellular telephone.  Two SEPTA supervisors, Harry McAllister and Joseph F. Marshall, and several Philadelphia Police Officers responded to the calls.  The remaining bus passengers were directed to a follower bus, and Mr. McAllister drove the bus to Franklin Mills Mall, the family's intended destination.

9.      On October 26, 2004, Ms. Dorsett requested that the driver of bus 5091 deploy the wheelchair lift.  The driver initially  refused, but deployed the lift after Ms. Dorsett told him that the stroller was in fact a wheelchair.  When Ms. Dorsett requested that the wheelchair be secured, the driver told her that he could not because the straps were not functioning.  However, when Ms. Dorsett went to secure the chair herself, the straps were functional.

10.     On October 30, 2004, at Academy and Newberry Roads, Ms. Dorsett requested that the driver of bus 5566 deploy the wheelchair lift.  The driver responded by

5

asking Ms. Dorsett to fold up the wheelchair and carry Naijah and it onboard the bus.  After a discussion with the bus driver over whether the stroller was a wheelchair, the driver deployed the lift allowing Naijah to board.  When he went to secure the chair, the driver used only one tiedown strap.  Ms. Dorsett could not secure the remaining straps until the bus stopped.

11.	On February 15, 2005, at Academy Road, Ms. Dorsett asked the driver of bus 5553 to deploy the wheelchair lift.  After initially refusing, the driver deployed the lift when Ms. Dorsett told him that the stroller was in fact a wheelchair.  When Ms. Dorsett asked the driver to secure the wheelchair, he said he did not know how to release the tiedown straps.  After Ms. Dorsett showed him how to remove the straps, the driver claimed that Naijah would be all right and returned to his seat.  The bus left the stop while Ms. Dorsett was still securing the wheelchair.

12.	On March 23, 2005, Ms. Dorsett asked the driver of bus 5577 to deploy the wheelchair lift.  After initially refusing, the lift was deployed when Ms. Dorsett told the driver that the stroller was in fact a wheelchair.

In summary, Naijah and Ms. Dorsett had three incidents in which they were unable to access the bus using the wheelchair lift, either because the bus did not stop or the driver did not deploy the lift.  There were three incidents when Ms. Dorsett recieved no assistance in securing Naijah's wheelchair, and four incidents when the assistance she did receive was insufficient to properly secure the wheelchair.  Finally, there were two incidents in which SEPTA employees were discourteous in responding to Ms. Dorsett's requests.

Ms. Dorsett reported at least nine of the incidents to SEPTA's Customer Service, incidents eleven and twelve took place after the filing of the instant action and were not reported

for that reason.  In response to each report, SEPTA counseled the individual drivers that Naijah's stroller was a medical device and that the drivers were required to render assistance when requested.  However, believing that it was easy to mistake a wheelchair similar to Naijah's for a regular stroller, SEPTA took additional steps to prevent further incidents regarding wheelchair strollers.

In addition to the individual driver counseling that took place after each incident, SEPTA posted notices and pictures of wheelchair strollers on employee notice boards in its depots, beginning at the depot that serviced Plaintiffs and later expanding system wide.  The same notice posted on bulletin boards was distributed to all SEPTA bus drivers directing them to be aware of such devices and assist passengers when necessary.  A segment on wheelchair strollers was added to SEPTA's eight hour refresher course on the ADA including step-by-step instruction on securing wheelchairs.  Over 600 of SEPTA's 2,100 bus drivers have attended this course since September 2003.  Informal training sessions on proper procedure for assisting wheelchair-using passengers also took place in the bus depots following Ms. Dorsett's complaints.

On September 14, 2004, SEPTA invited Ms. Dorsett and Naijah to meet with SEPTA managers at the Frankford Transportation Center.  Six of SEPTA's senior managers responsible for bus operations met with Plaintiffs that day.  At that meeting, SEPTA took Naijah and Ms. Dorsett onto each of its three types of buses to determine how to properly secure Naijah's wheelchair.  Photographs were taken of Naijah's wheelchair properly secured on each bus.  When it was discovered that the tiedown straps on one type of bus were too short to properly secure Naijah's chair, SEPTA refitted all 150 buses of that type with longer straps.

SEPTA also met with representatives at the Children's Hospital of Philadelphia to educate them about using specialized mobility devices on public transportation.

## II.   STANDARD

"Summary judgment is appropriate when, after considering the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact remains in dispute and `the moving party is entitled to judgment as a matter of law.'" Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991) (citations omitted).  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  The moving party carries the initial burden of demonstrating the absence of any genuine issues of material fact.[1]  Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993).  Once the moving party has produced evidence in support of summary judgment, the non-movant must go beyond the allegations set forth in its pleadings and counter with evidence that demonstrates there is a genuine issue of fact for trial.  Id. at 1362-63.  Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

---

[1]  "A fact is material if it could affect the outcome of the suit after applying the substantive law.  Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998) (citations omitted), aff'd, 172 F.3d 40 (3d Cir. 1998).

III.    **DISCUSSION**

Plaintiffs' Complaint brings two claims: a claim for damages and injunctive relief under the Rehabilitation Act and the Americans With Disabilities Act, 42 U.S.C. §§ 12101 *et seq* ("ADA"), and a claim for damages for violation of their statutory rights under the ADA pursuant to the Civil Rights Act, 42 U.S.C. § 1983.  I discuss each claim separately.

A.    **AMERICANS WITH DISABILITIES ACT CLAIM**

The protections afforded by Title II of the ADA and the Rehabilitation Act are substantially similar and, as a result, are collapsed into a single inquiry.  Doe v. County of Centiela, 242 F.3d 437, 446-47 (3d Cir. 2001); Smith v. City of Philadelphia, 345 F. Supp. 2d 482, 491 (E.D. Pa. 2004). Title II of the Americans with Disabilities Act prevents discrimination against the disabled in public services, programs, or activities. See 42 U.S.C. § 12132.  In particular, it is discriminatory for a public entity operating a fixed route public transportation system to purchase a bus that is "not readily accessible to and useable by . . . individuals who use wheelchairs."  42 U.S.C. § 13142(a).

In addition to purchasing the required equipment, the regulations implementing the ADA prescribe a certain level of service to be provided to the disabled.  The regulations require public transport agencies to train their personnel to "operate vehicles and equipment safely and properly assist and treat individuals with disabilities . . . in a respectful and courteous way."  49 C.F.R. § 37.173.  In addition, the regulations require certain procedures to be used in the event of an equipment breakdown, for example a bus with an inoperative wheelchair lift may remain in service for up to three days as long as a follower bus has an operable lift.  Id. § 37.163. Furthermore, isolated or temporary problems caused by equipment malfunctions are not violations of the ADA.  Id. § 37.161(c).  In short, the regulations "do not contemplate perfect

service for wheelchair-using bus commuters." <u>Midgett v. Tri-County Metropolitan</u> <u>Transportation District of Oregon</u>, 254 F.3d 846, 849 (9th Cir. 2001). Occasional problems, without more, do not constitute a violation of the ADA. <u>Id.</u> at 851.

      In order to establish a violation of Title II of the ADA, a plaintiff must show that (1) she was a qualified individual with a disability; (2) she was excluded in participation in or denied the benefits of a public entity's services, programs, or activities by the public entity or was discriminated against by the public entity; and (3) such denial or discrimination was due to the plaintiffs disability. <u>See</u> 42 U.S.C. § 12132; <u>Douris v. Bucks County Office of the District</u> <u>Attorney</u>, No. 03-5661, 2005 WL 226151, at *8 (E.D. Pa. July 6, 2004). If a violation of the ADA has been proven, enforcement of the Act may be through injunction or damages. In order to obtain compensatory damages for a Title II violation, a plaintiff must demonstrate intentional discrimination. <u>Ferguson v. City of Phoenix</u>, 157 F.3d 668, 674 (9th Cir. 1998); <u>Wood v.</u> <u>President & Trustees of Spring Hill College</u>, 978 F.2d 1214, 1219-20 (11th Cir. 1992); <u>Carter v.</u> <u>Orleans Parish Public Schools</u>, 725 F.2d 261, 264 (5th Cir. 1984) (per curiam); <u>Douris</u>, 2005 WL 226151 at *8 n.7. However, equitable remedies for violations of the ADA are available regardless of a defendant's intent. <u>Midgett,</u> 254 F.3d at 851; <u>Ferguson</u>, 157 F.3d at 674-75. As there are differing standards for monetary and equitable relief, we will discuss them separately.

      First, there is no evidence of intentional discrimination against Naijah by SEPTA. The record demonstrates quite the opposite. Every time Ms. Dorsett reported an incident to SEPTA Customer Service, an immediate investigation was undertaken. Furthermore, the affected drivers were counseled that not all wheelchairs look alike, reminded of their responsibilities to assist the disabled, and even though no driver was disciplined, Ms. Dorsett has not experienced a repeat incident with any SEPTA driver. In addition, SEPTA has taken steps to

prevent future incidents by meeting with Naijah and Ms. Dorsett to learn about their difficulties and changing their training and operational plans accordingly.  When an equipment problem was discovered at that meeting, it was remedied promptly.  As a result, there is no evidence that SEPTA acted with either a discriminatory animus towards Naijah or was deliberately indifferent to her problems using the SEPTA bus system.  See Ferguson, 157 F.3d at 675 (noting that a single test for intent in an ADA violation case has not been established, but affirming summary judgment because plaintiffs' claims failed under either test).  Compensatory damages are, therefore, unavailable in this case.

With respect to an injunction, Plaintiffs must demonstrate that they face an immediate threat of continued future violations of the ADA in the absence of injunctive relief. Midgett, 254 F.3d at 850.  While the evidence shows that Plaintiffs have had several undoubtedly frustrating incidents with SEPTA in the last two and a half years, and that SEPTA employees have on occasion avoided providing Naijah services as they are trained and required to do, there is little evidence suggesting that Plaintiffs face an immediate threat of continued future harm. Even though Ms. Dorsett must at times request the use of the lift, Naijah has not been denied access to a bus using the wheelchair lift since December 2003.  Ms. Dorsett has known how to properly secure Naijah's wheelchair since September 2004 and can tell drivers how to properly secure the wheelchair when they have difficulties.  Finally, SEPTA has altered its training programs for both newly hired drivers and refresher programs to include wheelchair strollers so that drivers will recognize the devices in the future.  As a result, an injunction is not appropriate in this case and I must, therefore, grant summary judgment.

**B.    CIVIL RIGHTS ACT CLAIM**

Plaintiffs have also brought a section 1983 action for the alleged violation of their rights under the ADA.  The doctrine of *respondeat superior* does not apply in actions brought under section 1983.  As a result, a municipality or municipal agency may only be held liable for the injuries directly attributable to its actions.  Monell v. Dep't of Social Servs., 436 U.S. 658 (1978).  Under Monell, a municipality may be liable under section 1983 if its policy or well-settled custom causes an injury.  See Estate of Henderson v. City of Phila., 1999 U.S. Dist. LEXIS 10367, at *56 (E.D. Pa. Jul. 9, 1999) (citing Monell, 436 U.S. at 694).  In order to obtain damages from a municipality, a plaintiff must prove that "municipal policy makers established or maintained a policy or custom which caused a municipal employee to violate the plaintiff's constitutional [or statutory] rights."  Id.  The policy must be the moving force behind the violation.  Furthermore, the policy must also exhibit deliberate indifference to the rights of those the policy affects.  Id.  A plaintiff must also present scienter like evidence of indifference attributable to a particular policymaker or group of policymakers.  Simmons v. City of Phila., 947 F.2d 1042, 1060-61 (1991).  In the absence of any policy, it is the plaintiff's responsibility to articulate a factional basis demonstrating considerably more proof than a single incident to support his claim.  House v. New Castle County, 824 F. Supp. 477, 486 (D. Del. 1985) (citing Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985)).

Plaintiffs have presented no evidence of a policy that is deliberately indifferent to their rights under the ADA.  Nor have they presented evidence of an intent to deprive them of their rights on the part of individual policymakers.  See *supra*.  As a result, summary judgment is appropriate on Plaintiffs section 1983 claim.

**IV.**      **CONCLUSION**

As I have concluded Plaintiffs are not entitled to damages or an injunction under the ADA and the Rehabilitation Act, and have failed to present evidence of a policy or custom intended to deprive them of their rights under the ADA, SEPTA's Motion for Summary Judgment will be granted.

An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| THERESA PETERSON DORSETT, on behalf of her granddaughter, NAIJAH PETERSON DEEDS, a minor, and on her own behalf, | : : : : | CIVIL ACTION |
| Plaintiffs, | : : | |
| v. | : : | No. 04-5968 |
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, | : : : | |
| Defendant. | : : : | |

## ORDER

**AND NOW** this     29th     day of August, 2005, upon consideration of Defendant Southeastern Pennsylvania Transportation Authority's Motion for Summary Judgment (Doc. No. 7), the Response in opposition, and the Reply thereto, it is hereby **ORDERED** that the Motion is **GRANTED**.

**BY THE COURT**:

/s/ Robert F. Kelly
ROBERT F. KELLY                    S.J.